Good morning. This first case is Case No. 4-16-0527, Alan Beaman v. Tim Freesmeyer, et al. Appearing for the appellant is Attorney David Shapiro. And appearing for the appellee and arguing is Attorney Thomas DeCiani. Is that correct? That's correct. And not arguing but appearing is Attorney Lucy Bednar. All right. Good morning. Before we begin, I would like to explain that Justice Steigman is a member of the panel that will be deciding this case. He is not able to attend oral arguments today due to a death in the family. There is a recording system, so Justice Steigman will have access to and will listen to oral arguments and will be a fully participating member of the panel that decides this case. All right. Mr. Shapiro, are you ready to begin? Good morning. You may please the court, counsel. Alan Beaman spent 13 years in prison for a murder he manifestly did not commit. This court should reverse the circuit court because Mr. Beaman deserves the opportunity to go to trial against the detectives who furthered his wrongful conviction and prosecution through their misconduct. A reasonable juror could find that these men doctored time trials, going fast when that hurt Alan and going slow when that hurt Alan. That they concealed exculpatory time trials from the jury and in a police report. That they lied to the grand jury about critical evidence about the time of the murder that made it impossible for Alan Beaman to have been there. And that they suppressed a polygraph report that inculpated John Murray, the steroid-crazed drug dealer who lied about his alibi, lied about his sexual relationship with the victim, beat women, and was owed drug money by the victim herself. I take it the favorable termination point is relatively straightforward since Mr. Beaman received both a certificate of innocence and a gubernatorial pardon specifically on the basis of innocence. I won't spend a lot of time on that unless there are specific questions because it's clear enough. And I'll address the other problems starting with probable cause. Now there are a lot of facts and a lot of disputed facts and inferences to weigh, Your Honors. But it boils down to four key points that are sufficient for reversal on the probable cause point. First, the unanimous Supreme Court not only threw out the conviction, but described the evidence in four words. This evidence is tenuous. It repeated that characterization of the evidence, tenuous, three times in the opinion in describing the evidence. That's a totally different standard. Using the word tenuous to reverse is a lot different than using that word describing probable cause if that were the specific issue. I think that, of course, these are different standards, probable cause and reasonable doubt. But tenuous is a characterization we assert that means tenuous. It wasn't an accident that they used it. And dictionary definitions of that term include thin, weak, and unsubstantial. And even one of the defendants, Defendant Zayas in this case, admitted that after the case had been sent to the state for prosecution, the case was, quote, not ready to be sent to the state. That's as clear as one gets in a case like this from an admission from one of the defendants that the case wasn't ready and wasn't probable cause. Well, since Zayas was perhaps, I think even you would concede, was less involved or the depth of his involvement was somewhat different, why doesn't that support the notion that we understand about immunity that it was the prosecutors that made the error? I mean, the police are sitting, and as I understand it, correct me if I'm wrong, all those things that you are asserting, any of the things that you would assert, are known by Souk and Ryan. First of all, that's not correct. Souk did not receive the Murray polygraph report. And that report, the Illinois Supreme Court unanimously said, showed that he intentionally avoided the test. Judge McDade, the federal judge in Peoria who adjudicated the federal case, was just looking specifically at the Murray polygraph report. And he held that that piece of evidence, that there was a genuine issue of material fact as to whether that piece of evidence was material under rating. Material, of course, meaning that it could have changed the outcome of trial. And so not all of the evidence was known to the prosecutors. But an additional point in response to this question is that police, and I'm turning away from the probable cause point for a moment, because I think your question, Justice Connett, goes more to the commence or continuation problem. There is not a single case in which an Illinois court has held in a wrongful conviction action that the principal detectives did not commence or continue the prosecution. And we cited 11 cases during Going the Other Way. It would be a radical innovation in the law to hold that these defendants did not commence or continue the prosecution, particularly where the evidence of misconduct is so strong. In fact, one area where the parties seem to agree is that there are disputed issues of fact as to the intentional misconduct question. Defendants didn't even respond to our argument that Friesmeier intentionally omitted an exculpatory time trial from his report, that he withheld that information from the jury, that he lied to the grand jury about the time of death evidence, and that he doctored time trials. Defendants just say on page 32 of their brief that they dispute any misconduct. Okay, so they dispute it. So that means Friesmeier can go to the jury and he can say that it was unintentional or accidental. Mr. Shapiro? Yes. I believe this case came down after a briefing was completed in this case. But are you familiar with the Seventh Circuit Court of Appeals decision in Colbert v. City of Chicago? I don't believe I'm familiar with that case. In that case, the Seventh Circuit Court of Appeals in a malicious prosecution claim stated the following, a plaintiff may not maintain a malicious prosecution claim against an arresting officer without first showing some post-arrest action which influenced the prosecutor's decision to indict. So given that statement, it would appear that the court must look not only at the actions of the officers but the effect that those actions had on the prosecutor's decision to indict. The court went on to state, while Officer Willingham's allegedly false statement constitutes a post-arrest action, there is no evidence that it influenced the prosecutor's decision to indict or that the prosecutor relied on it to obtain the indictment. There again, in that second quote, it indicates that the court must look at the effect that the officer's actions had either on the decision to indict or reliance by the prosecutor in his decision. If that is the state of the law that we should follow here, it appears that the prosecutor in this case, James Soup, testified at deposition that the officer's actions had no impact on his decision to prosecute Mr. Beeman. Would you agree with that? I would disagree both as to the state of the law and as to the assertion that if that is the standard, there isn't that sort of state of facts here. I'm sorry, my question as to your agreement is that was as to Mr. Soup's statement at his deposition. Did he not state that the officer's actions and alleged misdeeds did not play any part in his decision to prosecute or not prosecute him? I believe that he did and the court could also look to the Fabiano case where a number of prosecutors submitted affidavits saying we conducted an independent analysis of the evidence. We were not influenced by what the police decided. We went on the facts and the evidence and made an independent conclusion. And in that case, the first district reversed the grant of summary judgment in a malicious prosecution claim on the commenced or continued prong. Additionally, prosecutors rely upon detectives to conduct an investigation that is free of misconduct and free of jaundice. And if they don't, they're not in a position to fairly analyze the evidence. I mean, is there any doubt that if the defendants here had gone to the prosecutor and said, look, there's a stronger suspect here, we've got the wrong guy, it's John Murray. Or if they had said, look, the alibi is impossible here. There's no way that he could have done it. He's clearly home at 2.15 and he's clearly home at 10.37 and 10.39. On top of that, they knew that David Singley had told the police that he heard someone going down the stairs at 2 o'clock, leaving Ms. Laughlin's apartment. It's a very small building, four apartments. She's right across. You can hear what's going on. He hears the door open and close at 2 o'clock and hears someone go down the stairs. Is there really any doubt that if the detectives had gone to the prosecutors and said, look, this is impossible, there's no way this person could have done it, that that would have resulted in Mr. Beeman's youth, 13 years, not being spent in prison. Instead, there was opportunity after opportunity, Justice Harris, in this case, to see the red flag that said abort, abort, abort, whether it was the alibi evidence, whether it was the stronger evidence against John Murray. Instead of doing that, at point after point, the defendants transmogrified the evidence of innocence into evidence of guilt. There's the mysterious disappearance of the Murray polygraph. And in the Howard v. City of Chicago decision, the Northern District held that altering exculpatory information or suppressing exculpatory information in an investigative report is sufficient for commencement and continuation. That's very similar to what happened here. Not only was the Murray polygraph suppressed, but there were omissions in Friesmeier's police report, omissions in his... You've cited the Seventh Circuit. Well, what about the Seventh Circuit saying Friesmeier didn't lie? Friesmeier didn't submit a deceptive report regarding a time trial? I mean, that's in the Seventh Circuit case, isn't it? I don't believe that is in the Seventh Circuit case. I could be mistaken about that. The Seventh Circuit case was a very... In my sight, I've got one here. Okay, yeah, yeah. Friesmeier did not lie. I don't know what that means, other than he did not lie. The Seventh Circuit discounted plaintiff's argument that he prepared a Seventh Circuit police report regarding... Deceptive police report regarding the time trials. If that language isn't in there, then I'm wrong. If that language is in there, then you need to decide what part of the Seventh Circuit case you're relying upon and what part you're not. Well, one part that I'm certainly relying upon, Justice Knacht, is the finding that remains extant by Judge McDade that Defendant Warner, the jury could find, that he intentionally suppressed the Murray Holographic Report. That that evidence was material. And, in fact, it was part of the evidence... It was evidence that the Illinois Supreme Court itself said was... Showed that he was intentionally avoiding the task. There's also, on top of that, there is the doctoring of the time trials, going fast when that hurt Allen, and going slow when that hurt Allen. Did the jury know that the officer... No. I'm sorry. That he went 10 miles over the speed limit in order to make one of the time trials work? They may have known that, but what they did not know, and this is a critical point, is that Defendant Friesmeier did not tell them that he conducted a time trial using the bypass route. This is from the bank to the home. The bank video shows him at 10-11 making a deposit. Calls are made by Mr. Diemen, we say, from the home at 10-37, 10-39. Question is, can he make it in home from the bank in time to make those calls? And he does not tell the jury about the fact that he conducted a time trial using a route that showed Mr. Diemen had plenty of time to make it home, and to make those calls. That is also what he omits from his police report. One couples that with the disappearance of the Murray Holograph. I think if we're talking about malice and the jaundice view of the evidence, it's also key to talk about how the defendants treated the information that Carol Diemen provided. The significance of that was that Carol Diemen was showing that she couldn't have made it home to make those 10-37 and 10-39 calls. Why? Because she had a log from her mother's nursing home showing that she was first there, and then that she was at the Walmart across the street, which she documented with receipts showing her check-out. The Walmart was literally across the street from the retirement home. So here's what Friesmeier said. Carol Diemen drove 10 miles across town from the nursing home, made these two very brief calls to Alan's youth pastor, then drove 10 miles back all the way across town to go to the Walmart that was directly across the street from where she was before. That is not the sort of investigation or the sort of theory that one advances if one is playing it straight. And from all of that evidence of jaundice and misconduct, a juror could readily infer both malice, as well as conduct that contributed to the commencement or continuation of the prosecution. And, of course, Zook said that the case could not have been won without Timothy Friesmeier. It's important, too, to note the standard set forth in Fry v. O'Neill, where the court wrote, Liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the other elements of the tort are present. Friesmeier and the other defendants were right in the heart of the investigation, right in the heart of the bias and the misconduct that resulted in the wrongful conviction. Does the record show that Zayas expressed reluctance before Sook and Reiner, before Sook said, We've got enough. We're going forward. It's time. That is not reflected in the record. It was in his deposition. Is it inferred or is it just not? Is it unknown? There is no evidence that Zayas attempted to do anything to stop the harassment. There is evidence, I think, that Daniels expressed reservation at maybe the final meeting on it, where Sook made the comments about done enough, we're going forward, whatever it was he said. That's true. Would that be correct? Yes. And what role did he play in the investigation? He was one of the investigators. Not as substantial as Friesmeier, but still substantial. I think that's an accurate characterization, yes. Turning back to the probable cause point. Counsel, before you leave that, I'm sorry. Go forth where you're at in your argument. But still, on the last topic, in order to survive a summary judgment motion on this particular element that we've been discussing, what must, when you have the evidence that has been presented of alleged investigative misconduct, must the plaintiff also present some evidence of the effect that that had on the prosecutor's decision or reliance on the part of the prosecutor on that investigative misconduct? I believe that the answer to that question is no, because I know of no Illinois case that has ever required such a relationship. And we cited 11 state and federal cases in which the principal detectives involved in a wrongful conviction, action of a felony one where the detective doesn't have any opportunity to initiate the charges directly, resulted in surviving these positive motions, et cetera, in a malicious prosecution case. That said, if that is the standard, I think we meet it for all of the reasons that I said, and the fact that if the investigators had played it straight, not give the Murray polygraph, and gone to the prosecutor and said, look, this is impossible. Here are all the reasons it's impossible. Here is the much stronger suspect. I think we wouldn't be here today. I don't think Mr. Gaiman would have spent 13 years in prison. Let me touch very briefly on the probable cause point. We are entitled to all inferences to be drawn in our favor. That's regardless of whether one calls it a mixed question or a question of fact. There is a thicket of disputed facts and inferences on probable cause to consider and to weigh. And the Supreme Court, almost all of the evidence is based upon Mr. Gaiman's vote. The Supreme Court looked at all of that evidence, and it said on page three of the decision, Petitioner considered the relationship to be over as of July 25, 1993. Sure, there was this stale vote of evidence before that point, before Mr. Gaiman had left the Bloomington normal area to go to Ohio and then to his parents' home. But all of the witnesses monolithically said that he was over it. Those who had seen him after July 25 said, for example, Swain, he calmed down and was over it. That's a record, 8749. Josh Whitney, he was no longer angry about anything. That's a record, 8740. The evidence was so much stronger of probable cause in the Fabiano case. There were multiple witnesses who came forward and said, they were children, they said, we were molested by Sandra Fabiano. And the appellate court said that that was not sufficient evidence for probable cause as a matter of law. Contrast that with this case, where there is not a shred of probative physical evidence, where there is not a shred of eyewitness testimony. There is evidence that is more than sufficient to go to a jury here. I touched on – oh, I see my time is up. Thank you, John. It is. Thank you. You'll have time and reply. Mr. DeCiani. Good morning. May it please the court, counsel. My name is Thomas DeCiani, and I represent the town of Normal and three of its police officers, David Warner, Timothy Friesmeier, and Frank Zayas. What the plaintiff is pursuing here is a brand-new malicious prosecution type of cause of action. And I think we've heard it right from counsel's lips here in court. They are pursuing a cause of action in which the police have to go to the prosecutor after the prosecutor has made an independent determination and tell them, this is impossible. You shouldn't be prosecuting this case. Now, if they obtained some evidence that made that clear, that has to be presented to the prosecutor as well. If the prosecutor wants their opinion, they should give that as well. But in this case, the prosecutor had all the information, all the evidence. The prosecutor was involved in the investigation from the beginning. The prosecutor was presented with the evidence as it was unfolding. The prosecutor knew about everything that they talk about. How about Murray's polygraph? That's the only thing the prosecutor didn't know. But Suke said at his deposition, I've seen the polygraph since then. To me, it's meaningless. And it could be construed as meaningless. And it's not like Murray was a secret to Suke and the prosecutors. They knew all about John Murray. They were prosecuting his cases involving the domestic violence and drug delivery charges. They had him on their witness list. They knew all about John Murray. They interviewed John Murray in preparation for the Beeman trial and decided not to call him because he was a material witness. He was one of the witnesses who was in the home of Jennifer Lockmiller when Beeman knocked on the door one time. So the prosecution knew all about John Murray. Could I ask you then a question that I asked Mr. Shapiro? In order to survive summary judgment in this case, must the plaintiff have presented evidence of the prosecutor's reliance on the investigative misconduct by the officers in this case? Is that an element in the malicious prosecution claim here? Yes. And we say that it had to have influenced the prosecution in a way that would have affected the prosecutor's decision. And in this case, James Suke gave a deposition and said that none of the alleged investigative misconduct would have had any bearing on his decision to prosecute. Is that right? That's correct. Okay. Mr. Suke had prosecutorial immunity. Is that right? That's correct. Where is the incentive on Mr. Suke's part to indicate that he would have made a different decision had he known of the investigative misconduct if he's immunized? Well, I think that we can have some faith that a prosecutor is going to tell the truth when under oath. He's a judge. He's a jurist who has been around for a while. I think the incentive is that he's going to tell the truth. And I think there have been lots of cases in which prosecutors have come forward and said, had I had this particular piece of evidence, I would have looked at this whole thing differently, despite their immunity. One of the things that... Does he ever explain in any detail why he thought that one was a better suspect than the other? He did. He went into it in great detail. He said that the evidence of Beeman's motive, and motive had a lot to do with it. Suke said the evidence of Beeman's motive was the strongest he had ever seen in his career. He was the chief of felony division in McLean County State's attorney's office. He felt Murray had no motive at all. And I don't know the extent to which the court would want to put itself in a situation where it's going to second-guess these judgments. Murray was having a casual sexual affair with Jennifer Lockmiller. He'd provide her with drugs. The two of them would have sex. There was some testimony that came out that she may have owed him $20. There was no history of any violence or contentiousness between them. They were friends. Does a prosecutor have to believe that a $20 debt between two people who are friends and have a sexual relationship is sufficient motive to murder somebody? As opposed to Mr. Beeman, who was passionately in love with Jennifer, as all the evidence showed, had been violent in her direction by knocking down her door twice. And there was a lot of different evidence from some of the people who knew both of them about Jennifer's fear of him, about threats that he made. Now it's coming in through Jennifer's comments to a friend to them. But this is all information that's relevant to a determination as to whether you want to go forward with a prosecution. Did Mr. Suit indicate at his deposition when he expressed the thought that his prosecutorial decision would not have been impacted by any of the evidence of investigative misconduct? Did he indicate that he was aware of all of the things that plaintiff alleges constitute investigative misconduct? Yes. The only one which he did not know about, which I addressed, was the polygraph. Okay, but at the time of his deposition, he knew about that allegation. He knew about that at that point. And even with that in mind, he expressed the thought that it would not have swayed his decision. Yes. And, you know, let's look at the items of alleged misconduct. They say that Friesmeier lied at the grand jury. The question put to Friesmeier was, did anybody in the building provide you with any information that you found to be relevant to time of death? Both Suit and Friesmeier and other detectives looked at Singley's comments, his statements, and they thought that he wasn't sure about the date. They had interviewed other people, and they did a lot of investigation as to when the time of death would have occurred. And they narrowed it down between 12 and 2 based on her school schedule and based on other people who were coming to see her that day. Singley said, I may have heard something after 2 o'clock, but he wasn't sure that it was the correct day. And Suit knew about that. Singley also made some statements about hearing the air conditioner going off and on over the days after she was dead but before her body was found. They investigated that, and they found that it had some type of mechanism in it that would go on and off, kick up, go on. Suit knew about that. Was there something about the parking lot or the cars or knowing which car was where? I don't remember that part. I don't remember that part. The whole business about the time trials, Suit was involved in that all along. Friesmeier was reporting to – Suit had sent Friesmeier out to investigate the alibi evidence that was presented after the prosecution decision was made. And that came from plaintiff's mother. And mother came up with – narrowed the window that they were working with originally. They were working with a window of 10 o'clock in the morning or about 10 o'clock in the morning to 3.30, which were based on Beeman's statements to the police. After he was indicted, plaintiff's mother came up with evidence that she came home at 2 o'clock and he was in bed. So Suit sent Friesmeier out to test that. Let's see if that's – does that destroy the alibi or – I mean, does that confirm the alibi or is there still a hole in the alibi based on that? Friesmeier went out and tested it. Now, he testified at the grand jury about the time trial, the bypass route. He didn't put it in his report, but he testified about it at the grand jury. And he was – he testified about the time trials at trial. So Beeman's attorneys had the ability to cross-examine him at trial based on the grand jury testimony, based on his report, based on everything else they knew. They could have questioned him about the bypass route. It wasn't hidden from Suit. Now, they're saying Friesmeier relied on the witness stand because he didn't bring up – affirmatively bring up the bypass route. From my experience in trials, witnesses answer the questions that they're asked. Suit didn't ask him about the bypass route. And neither did Beeman's attorney on cross-examination ask him about the bypass route. So are they trying to impose some duty on a police officer to stand up in the middle of a trial and say, wait a minute, wait a minute. Nobody asked me about this other bypass route that I also tested. I don't know that this court wants to put that type of a duty on a police officer ever. Was I – do you think I was correct regarding the Seventh Circuit doing some evaluation of Friesmeier's testimony? Yes. And actually stating directly he didn't lie and he didn't file a deceptive police report. I believe that's true. I won't – my memory of it – I read it a few days ago. My memory of it isn't that clear. But I – if they didn't say that explicitly, they certainly said it. They certainly meant it. Because they talked about the concept of a conspiracy. And that was their whole theory in federal court was that there was this conspiracy between the prosecutors and the police. And the Seventh Circuit said there's no proof of conspiracy to go to trial in this case. Because the – the mistakes in this case, if there were mistakes, and our Supreme Court said there were mistakes. So I don't quarrel with that. But the mistakes in this case that led to the reversal were the prosecution's mistakes. They didn't turn over the Brady material. They had it. They didn't turn it over. Suk explained at his deposition, I didn't turn it over because I didn't think it was Brady material. I didn't think it was material to the lawsuit. I had – Murray was – to me, Murray's only involvement in this case of any interest was that he was a witness to Beeman having broken down the door once. I didn't see him as a viable suspect. So I didn't turn over his materials. Now, that doesn't apply to the polygraph. I have a serious question about whether the Supreme Court would have reversed this case if it was just the polygraph that issued. But we can only speculate about that. With the commensurate continued prong here, Plaintiff's Counsel cited a number of cases in his briefing relating to coercive interrogations. And, I mean, there's quite a bit of case law relating to malicious prosecution claims that stem from coercive interrogations. In those cases, is there any helpful law relating to the commensurate continued prong relative to the prosecutor's knowledge of the coercive interrogation and whether or not the prosecutor explicitly relied on the results of those interrogations in order for Plaintiff to succeed in the malicious prosecution claim? Yes. There are a number of cases, and we've dealt with them in our brief, where detectives and investigators have been named as defendants in malicious prosecution cases. Every single one of those cases involved an allegation of the creation of evidence that wouldn't have existed if it had not been for the alleged misconduct, coerced confessions, fabricating witness statements, coercing witnesses into saying something that they didn't say, none of which is the case here, I want to point out clearly. None of the cases is the case here. In those cases, some courts have said that prosecutors, no prosecutor is going to say, yeah, I would have prosecuted him anyway, even if I knew that his confession was false and coerced. So it's a given in those cases that the actions of the police had a proximate cause on the prosecutor's decision. That is the element that is missing here that is different from every other case that they've cited. And yes, there have been wrongful conviction cases where police have been at fault. We're all familiar with Chicago and the torture cases, the horrible things. None of that's here. None of it. This is a classic murder investigation. The police conduct a nine-month investigation. They narrow it down to a suspect that they think is, that everything in the investigation points to. And I'll point out that they consulted with the Homicide Division of the Chicago Police Department. They gave them all the evidence and they said, you're on the right track. Keep going the way you're going. And they present that to the prosecutor and the prosecutor says, okay, we've got enough. We're going to go forward. I don't believe any case has ever put a duty on an investigator like they want to impose on Zias to say, wait a minute. Wait, wait, wait. You've got all the evidence, but you shouldn't prosecute. And first of all, I want to talk about Zias for a minute. I don't want to get sidetracked. I hope I answered your question. But Zias' memory was horrible 20-something years after the incident. And if you read his deposition, his memory is really poor. However, he never said there was no probable cause. He seemed to believe, based on his memory, that the prosecution decision hadn't been made yet by the time he retired. But it had been. It was made in May of 1994. He retired in November of 1994. And, in fact, there's a photograph of the press conference in which the indictment is where the arrest is being announced. And it's Police Chief Frank Zias and Rainer in the photograph. So his memory was bad on it. So he believed that they hadn't gotten to the prosecution point by the time that he retired. They actually had. But he did, however, indicate doubt as to going forward. Well, he said there was more work to do. More work to do. Yeah. And there was more work to do. I mean, I think that investigation continues after somebody's indicted. That's not unusual. Would it be correct that Daniels expressed that somewhat more forcefully? Daniels expressed it expressly. Daniels had gone to a cold case conference in Florida. And they discussed the Lockmiller murder. Daniels was given, based on this conference with all these investigators from all over the country, a list of follow-up investigation that should be done. So when they had this meeting in May in which Friesmeier was present, Zias, Police Chief Tony Daniels, and Suk and Rainer, and they talked about the evidence, they laid out the evidence, Daniels said, wait a minute, I've got this list of things that I came back from Florida with. I think we should follow this up before we make a decision. Suk said, this comes from Daniels now, who is not a party and has been a proponent of Beeman's innocence for a while. Daniels says, no, Suk turned to me and said, I don't think we need to do that. We've got enough. We've got our guy. We're going forward. That's as classic a piece of evidence as you can get, or as convincing a piece of evidence as you can get, that the prosecutors made the decision. And this is a case, what they're arguing for is a new cause of action that I think would be, well, I'll submit to the court, would be a leap from the current state of the law. The Supreme Court has said many times that malicious prosecution is a disfavored cause of action. And that has to mean something. It has to mean that courts should be careful about doing anything that expands that cause of action. If there's going to be any significant expansion, which is what they're asking for, they're asking for a radical expansion of what malicious prosecution would be. The Supreme Court has to do it, or the legislature has to do it. But the Supreme Court has been cautious about that. One of the arguments they've raised, and their amicus raised it, and it needs to be talked about, is that they're asking this court to make this case go to trial because they believe it will have a deterrent effect. And this all goes back to what's been recognized as a problem of wrongful convictions. That is not the purpose of our malicious prosecution cause of action in Illinois. There is a whole body of federal constitutional law that covers police misconduct and the impact that it has on society in general, and the impact it has on arrestees. That's where that litigation takes place. And, interestingly, just recently the United States Supreme Court in Manuel v. City of Joliet expanded the Fourth Amendment's reach to even past indictment decisions. So if there's going to be an expansion or any alteration in the law based on principles that could be deterrent, that has to come from other sources, not from this court. I'm getting to the end. I would clarify that what we've been saying in the law on commencement is accurate. This is a classic case where the prosecutor made the decision. The United States Supreme Court in Rayburg said when they granted testimonial immunity to police officers for grand jury testimony, they said doing anything else would hold the police officers off like targets because the prosecutor has the immunity and the police don't. So the prosecution makes the decisions about what takes place at a grand jury. Prosecution makes the decisions about whether this case should have gone forward or not. And to hold the police responsible for that when the prosecutor knew everything that was relevant to the case, I submit to the court it's not the precedent that the court wants to set. Thank you. All right, thank you. Mr. Shapiro. Your Honor, there's absolutely no federal recourse available to Mr. Beaman for malicious prosecution. That's another tragedy of this case in addition to the fact that Mr. Beaman spent 13 years in prison, in addition to the fact that the shoddy investigation that resulted in the perpetrator still wandering the streets today. The reason there's no federal recourse for Mr. Beaman is that he fell into an unfortunate gap in the law where when we brought the case in federal court, there was no malicious prosecution that could be raised as a constitutional claim because of binding Seventh Circuit law. Recently, I believe it was last month in the Manuel v. City of Joliet case that Mr. DeCiani mentioned, the Supreme Court threw out the Seventh Circuit rule and says now there is a Fourth Amendment claim for malicious prosecution in federal court. That's great for people who are victims of malicious prosecution going forward. It's good for future hypothetical Mr. Beamans. It does not do any good, bring any accountability to this situation or any recourse to the real and actual Mr. Beaman. As for the argument about is there a requirement of influence on the prosecutor or overbearing influence, the answer is no. In the Fabiano case, the police reported the statements of the children to the prosecutors. Many of the prosecutors affirmatively disclaimed in affidavits the idea that there was any influence over them or that they didn't do anything other than conduct their full and independent evaluation of the evidence. And the First District reversed a grant of summary judgment in a malicious prosecution claim on the commenced or continued prong. Frye v. O'Neill. You have one officer who's receiving the information about a potential drug dealer in an apartment complex. He relays that information to someone who's described as a special agent. The special agent presents it to the grand jury. There's no suggestion of some kind of undue influence over the person presenting the case to the grand jury. It's a black and white standard that this court stated in Frye v. O'Neill. Liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are met. And the defendants want to minimize the impact of the John Murray polygraph report and suggest that it would not have had an influence on the prosecution. Look at what the Illinois Supreme Court said. The Supreme Court unanimously said that that piece of evidence showed that Murray was intentionally avoiding the test. And look at what Judge McDade said, that a jury could find that that piece of evidence was material, meaning that we could have changed the outcome of the trial. That was an absolutely critical piece of evidence that was withheld from the prosecution. Nor can we downplay the omissions in the police report. With regard to the time trials, that same time trial that I mentioned about the route from the bank to the house, that was omitted from the police report, was also omitted from Friesmeier's grand jury testimony, stands out. Why? Because every other time trial is recorded in detail in Friesmeier's police report. It's a remarkably detailed report with information like what he did with the cats in the victim's apartment while they were processing the scene. But it does not contain the time trial that showed Allen Beeman had an ironclad alibi. I think you're contradicting each other. We'll have to make a determination. I understood opposing counsel to say that he did testify about the time trial that is not referenced in the report, that he did testify about that before the grand jury. Before the grand jury, yes. Before the jury, no. And it was in response to a direct question about whether he took the bypass route. That was the route that showed that there was plenty of time. So he's asked, and this is record 2485-86, as opposed to going down Meridian Road to the high-speed bypass over to Alpine Road and then up north to Bell Federal. In other words, he took a route other than that route, other than the bypass route. Friesmeier says, yes, that would be correct. That's before the jury. That's the same time trial that is omitted from the police report. And that's in addition to the fact that Friesmeier testifies before the grand jury, having spoken to David Singley. And I don't know where Ms. Desiani is getting this idea that Mr. Singley wasn't sure about hearing footsteps going down the apartment at 2 o'clock. The police asked him about that once. They came back. They asked him about it again. He said the exact same thing both times, sure of it, heard a door open and close, footsteps going down at 2 o'clock, making it impossible for Mr. Beeman to have been the murderer. He doesn't tell the grand jury about this. And for all of these reasons, a jury deserves to hear this case. Thank you, Your Honors.